**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

VITAMINS ONLINE, INC., a Delaware
corporation

      Plaintiff-Appellee/Cross-
      Appellant,

v.

HEARTWISE, INC., an Oregon
corporation, d/b/a NatureWise,

      Defendant-Appellant/Cross-
      Appellee.

Nos. 20-4126, 21-4152

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:13-CV-00982-DAK)**
_____

R. Joseph Trojan (Dylan C. Dang and Francis Wong with him on the briefs), Trojan Law
Offices, Beverly Hills, California, for Defendant-Appellant / Cross-Appellee.

Chad E. Nydegger (David R. Todd with him on the briefs), Workman Nydegger, Salt
Lake City, Utah, for Plaintiff-Appellee / Cross-Appellant.

_____

Before **CARSON**, **BALDOCK**, and **EBEL**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

On Amazon, success depends in large part on a product's branding and reviews. So, when Plaintiff Vitamins Online, Inc. believed that its competitor, Defendant Heartwise, Inc. (d/b/a NatureWise), was misrepresenting the ingredients of its competitive nutritional supplements and manipulating those products' Amazon reviews, Vitamins Online sued for violations of the Lanham Act (15 U.S.C. § 1125(a)) and Utah's common law Unfair Competition Law (the "UCL"). The case proceeded to a bench trial, at the conclusion of which the district court ruled for Vitamins Online and ordered disgorgement of NatureWise's profits for 2012 and 2013. The court also awarded Vitamins Online attorney fees and costs for NatureWise's willful misrepresentation and for various discovery abuses.

Both parties now appeal the district court's decision for multiple reasons. NatureWise contends that the district court erred in finding that it made false or misleading representations about its own nutritional supplements' ingredients and its Amazon reviews. Concerning the reviews of its own products, NatureWise argues that it was not misleading either (a) to instruct its employees to up-vote favorable Amazon reviews and down-vote unfavorable reviews, or (b) to offer free products to customers in exchange for reviews. NatureWise further asserts that the district court erred in concluding that Vitamins Online was entitled to a presumption of injury for these misrepresentations. Finally, NatureWise claims that the district erred in calculating profits and that attorney fees were unwarranted.

For its part, Vitamins Online contends that the district court erred in bifurcating Vitamins Online's injury into two separate time periods and requiring

Vitamins Online to prove that a presumption of injury is applicable separately for each period. Vitamins Online also asserts that the district court erred in denying disgorgement for the second time period, and for failing to consider an award of punitive damages and an injunction as to NatureWise's further manipulation of reviews.

Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that the district court did not clearly err in applying a presumption of injury. We affirm the award of profits, attorney fees, and costs, and find no reversable error in the amount awarded. We also hold that the district court failed to consider properly Vitamins Online's request for punitive damages and an injunction, and we remand those issues for the district court to reconsider. We thus AFFIRM the district court's liability determination under the Lanham Act and UCL, AFFIRM the award of profits, attorney fees, and costs, and REMAND for further proceedings.

## I.  BACKGROUND

### A. Factual background.

Vitamins Online and NatureWise both sell nutritional products on Amazon. This case concerns garcinia cambogia and green coffee extract, which both purportedly help with weight loss.

Vitamins Online began selling garcinia cambogia in 2011. All garcinia cambogia products contain hydroxycitric acid (HCA), but Vitamins Online's garcinia cambogia product specifically contains a patented ingredient called SuperCitrimax, which provides 60% calcium/potassium salt HCA and is clinically proven to help

support weight loss (unlike generic garcinia cambogia, which often lacks the high percentage of HCA and lacks such clinical support). Before the middle of 2013, a few garcinia cambogia products on sale contained SuperCitrimax, but by the middle of 2013, Vitamins Online was the only seller of SuperCitrimax on Amazon.

Vitamins Online started selling green coffee in 2012. Vitamins Online's green coffee contains an ingredient called Svetol, which the district court found was the only green coffee extract clinically proven to assist with weight loss. Vitamins Online spent millions advertising its green coffee and emphasized that it is the only green coffee product to contain 400 milligrams of Svetol per dosage.

Both garcinia cambogia and green coffee were featured on the Dr. Oz Show, which is a known driver of sales in the supplement industry. Dr. Oz's 2013 show on garcinia cambogia featured the chief researcher for SuperCitrimax, leading Dr. Oz to urge his viewers to buy only garcinia cambogia containing at least 50% HCA and potassium or calcium/potassium. The district court found that, after this show, Vitamins Online's sales increased substantially.

The Dr. Oz Show had two features on green coffee in 2012, and both shows caused the sale of Vitamins Online's green coffee to spike. During the second show, Dr. Oz told his viewers to look for Svetol or Green Coffee Antioxidants (GCA) products that had at least 45% chlorogenic acid, dosages of 400 mg (3x per day), and costs no more than about $30 for a 30-day supply. Vitamins Online's green coffee sales increased dramatically after this show because Vitamins Online's green coffee

4

matched Dr. Oz's description. It eventually reached a #1 ranking as an Amazon Best Seller.

NatureWise began to sell its first green coffee product in the summer of 2012 due to increased consumer demand for the product. NatureWise's first green coffee product advertised 50% chlorogenic acid—although it had no testing to support this. The front of the bottle also stated that it contained "Clinically Proven GCA" and referenced a 2012 study on GCA, even though NatureWise's founder knew that the product contained only 5 milligrams amounts of GCA—far less GCA than the 350 milligrams used in the clinical GCA study. App'x vol. 4, at 1000.

In March 2013, NatureWise's founder began testing its first green coffee product and found that some lots did not match the label claims. NatureWise nevertheless continued selling the product without recalling any lots. Eventually, NatureWise increased the amount of GCA to the same dosage that was used in the above-referenced GCA study by Vitamins Online, although around this time NatureWise's founder had learned that the GCA study had significant flaws. Indeed, the GCA study would end up being retracted in 2014.

By this point, NatureWise was also selling a second green coffee product, which it advertised as containing 300 milligrams of a proprietary green coffee extract with GCA and 133 milligrams of Svetol. As with the first green coffee product, NatureWise's founder learned that this product did not meet its label claims in March 2013, yet despite demands from NatureWise's producer, NatureWise neither recalled products nor contacted any customers about this. Rather, NatureWise attempted to

sell as many of its products as possible before hitting a deadline imposed by the producer and only stopped due to concerns about getting in trouble with its producer for selling beyond the deadline.

NatureWise launched its first garcinia cambogia product in January 2013. NatureWise's founder was aware of Vitamins Online's garcinia cambogia product when it launched its own product, and even used Vitamins Online's product information on Amazon to develop the claims for NatureWise's garcinia cambogia. Although NatureWise's garcinia cambogia did not contain SuperCitrimax, NatureWise's founder specifically wanted to advertise SuperCitrimax because Vitamins Online was selling it, and thus NatureWise referenced SuperCitrimax on its Amazon product page and included the SuperCitrimax logo on the garcinia cambogia label. NatureWise also advertised its product as being clinically proven and having a patented form of 60% HCA bound to calcium and potassium, which implied that the product contained SuperCitrimax. NatureWise's founder was aware that it did not have the authority to make these claims, since NatureWise was unable to obtain a licensing agreement for SuperCitrimax. This SuperCitrimax advertising by NatureWise eventually ceased at an unspecified date.

Both Vitamins Online and NatureWise relied on Amazon for sales of their supplements. On Amazon, each product has its own product page with a miniature scoreboard, which shows the number of reviews a product has and the average rating of a product in the form of stars. Customers can rate a product between 1 and 5 stars—5 being the best score. Customers can also leave written reviews of a product.

Anyone can rate existing reviews as "helpful" by up-voting reviews, or conversely as "unhelpful" by down-voting a review. The reviews deemed "most helpful" are prominently displayed on a product's page and those ranked least helpful are bumped down to later pages.

Reviews are important to customers, and a product's star rating affects customers' purchasing decisions. NatureWise's founder believed that Amazon reviews were important to NatureWise's success and that they would influence NatureWise's sales. To this end, NatureWise asked its employees—who complied—to up-vote good reviews for its products and down-vote its products' bad reviews (known as "block voting"), thereby affecting which reviews appeared at the top of the products' pages. This was a violation of Amazon's policies, and so NatureWise's management did not want Amazon to learn of this practice. In addition, NatureWise offered free products to customers in exchange for a review. This also violated Amazon's policies.

Prior to NatureWise's entry in the market, Vitamins Online's green coffee and garcinia cambogia products were both #1 Amazon best sellers. This ranking as "best seller" is automatically generated by Amazon for product categories, and those products ranked in the first or second position have a competitive advantage. After NatureWise entered the market, both of Vitamins Online's products involved in this case were overtaken by NatureWise's products. NatureWise's products thereafter consistently obtained #1 rankings on Amazon, effectively replacing Vitamins Online's products' previous #1 ratings. During 2012 and 2013, NatureWise made

$7,251,118 from selling its green coffee products and $2,300,114 from selling its first garcinia cambogia product, therefore totaling $9,551,232 in profits.

**B. Procedural background.**

Vitamins Online sued NatureWise in 2013.  In its complaint, Vitamins Online alleged that NatureWise engaged in false advertising under the Lanham Act, both by presenting false information about its own (NatureWise's) products' ingredients (the "ingredient claims"), and by engaging in block voting and providing free products for reviews (the "review claims").  Vitamins Online also alleged that NatureWise violated Utah's common law unfair competition law (UCL) for similar reasons.

The trial court held a bench trial in the summer of 2020 and determined that Vitamins Online had proven both its Lanham Act and UCL claims for the years 2012 and 2013, but not for 2014 and beyond.  The court held that NatureWise both misrepresented its ingredients and that its manipulation of Amazon reviews constituted false or misleading representations.  The court also determined that Vitamins Online was entitled to a presumption of injury for 2012 and 2013, in contrast to its conclusion at summary judgment that Vitamins Online was not entitled to such presumption of injury.  The court awarded Vitamins Online a disgorgement of NatureWise's 2012 and 2013 profits of $9,551,232 for the Lanham Act claim as well as for the UCL claim (to be awarded as a single payment of $9,551,232), with a prejudgment interest rate of 2.13% per annum beginning on January 1, 2013.  The court denied enhanced damages, punitive damages, and injunctive relief.

The court also found that NatureWise had engaged in various discovery improprieties. For example, NatureWise's founder deleted emails despite his awareness of his duty to preserve evidence, failed to produce hundreds of emails to Amazon that he claimed had been sent, and failed to produce detrimental documents that were discovered via third-party subpoenas. For this reason, the district court awarded Vitamins Online attorney fees and costs.

NatureWise timely filed a notice of appeal challenging the district court's judgment and then subsequently filed a Chapter 11 petition for bankruptcy, thereby triggering an automatic stay. Once the bankruptcy stay was lifted, Vitamins Online promptly filed its notice of cross-appeal. In its cross-appeal, Vitamins Online challenges the district court's decision to bifurcate its injury into two time periods and to require proof of causation separately for both periods (2012-2013 and 2014+). Vitamins Online also challenges the district court's denial of disgorgement for this later period, and argues that the district court failed to adequately consider its request for injunctive relief and punitive damages.

## II. DISCUSSION

This appeal concerns both a Lanham Act false advertising claim and a Utah common law unfair competition claim. To succeed on the merits of a false advertising claim under the Lanham Act, a plaintiff must show (1) that the defendant "made a false or misleading description of fact or representation of fact in a commercial advertisement about [its] own or another's product;" (2) that the "misrepresentation [wa]s material, in that it [wa]s likely to influence the purchasing

decision;" (3) that the "misrepresentation actually deceive[d] or ha[d] the tendency to deceive a substantial segment of its audience;" (4) that the defendant "placed the false or misleading statement in interstate commerce;" and (5) that the plaintiff "has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." Bimbo Bakeries USA, Inc. v. Sycamore, 29 F.4th 630, 643–44 (10th Cir. 2022) (quoting Zoller Lab'ys, LLC. v. NBTY, Inc., 111 F. App'x 978, 982 (10th Cir. 2004) (unpublished)). As to liability, only the first and the last prong are at issue on appeal—i.e., the falseness of NatureWise's representations and the injury to Vitamins Online. The remedies awarded by the district court are also at issue.

Under Utah common law, "unfair competition includes—but is not limited to—passing off, palming off, imitating, and causing or likely causing confusion or deception." Overstock.com, Inc. v. SmartBargains, Inc., 192 P.3d 858, 862 (Utah 2008) (quoting Rocky Mountain Bell Tel. Co. v. Utah Indep. Tel. Co., 88 P. 26, 28 (Utah 1906)). "It is enough if it be shown that there is the probability of confusion or deception." Id. (quoting Hi–Land Dairyman's Ass'n. v. Cloverleaf Dairy, 151 P.2d 710, 717 (Utah 1944)). NatureWise's liability under the UCL and the remedies awarded thereunder are both at issue.

## A.    Standard of review.

In an appeal from a bench trial, the district court's factual findings are reviewed for clear error and its legal conclusions are reviewed de novo. Keys Youth Servs., Inc. v. City of Olathe, 248 F.3d 1267, 1274 (10th Cir. 2001). The decision to

award disgorgement is reviewed for abuse of discretion, the amount disgorged is reviewed for clear error, and the methodology used to determine that amount is reviewed de novo. Klein-Becker USA, LLC v. Englert, 711 F.3d 1153, 1162 (10th Cir. 2013). "[O]rders granting or denying attorney's fees under the Lanham Act [are reviewed] for abuse of discretion," but the underlying legal principles are reviewed de novo. Derma Pen, LLC v. 4EverYoung Ltd., 999 F.3d 1240, 1244 (10th Cir. 2021). A grant or denial of a permanent injunction is similarly reviewed for abuse of discretion. EagleMed LLC v. Cox, 868 F.3d 893, 899 (10th Cir. 2017). As is a ruling on punitive damages. Ensminger v. Terminix Int'l Co., 102 F.3d 1571, 1576 (10th Cir. 1996). A district court abuses its discretion when its decision is based "on an erroneous conclusion of law or when there is no rational basis in the evidence for the ruling." Wilderness Workshop v. U.S. Bureau of Land Mgmt., 531 F.3d 1220, 1223–24 (10th Cir. 2008) (quoting Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1065 (10th Cir. 2001)).

**B.    Vitamins Online's cross-appeal was timely.**

Before getting to the merits of the appeals, we must consider the timeliness of Vitamins Online's cross-appeal. A notice of cross-appeal is due within fourteen days of the filing of the initial notice of appeal or before the deadline for the initial notice of appeal expires—whichever period ends later. Fed. R. App. P. 4(a)(3). Vitamins Online, however, filed its notice of cross-appeal on December 23, 2021—over a year after NatureWise filed its notice of appeal. Vitamins Online contends that, despite this delay, its notice of appeal is timely because it was barred from filing a notice of

11

appeal any earlier due to a stay caused by NatureWise's Chapter 11 petition for bankruptcy.  We agree.

A Chapter 11 bankruptcy petition automatically stays "the <u>commencement or continuation . . . of a judicial . . . action or proceeding</u> against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]"  11 U.S.C. § 362(a)(1) (emphasis added).  If there is a pending non-bankruptcy deadline when this stay takes effect, then this deadline is tolled until the later of either "the end of such period" or "30 days after notice of the termination or expiration of the stay."  11 U.S.C. § 108(c)(1)(2).  The issue, then, is whether Vitamins Online's cross-appeal constituted a "commencement or continuation" of a judicial action or proceeding such that the deadline for filing it was tolled until thirty days after the stay was lifted, pursuant to § 108(c)(2).  11 U.S.C. § 362(a)(1).  We answer that question in the affirmative.

The Eighth Circuit's decision in <u>In re Hoffingers Inds., Inc.</u>, 329 F.3d 948, 952 (8th Cir. 2003), is persuasive here.  There, our sister circuit held that "an appeal . . . in a case in which the debtor originally was the defendant is a 'continuation' of a 'proceeding against the debtor'" such that § 108(c) tolls the deadline of an appeal against a debtor.  329 F.3d at 952.  This makes sense.  The purpose of the automatic stay is to give "the debtor a breathing spell from his creditors" by stopping "all collection efforts, all harassment, and all foreclosure actions."  WILLIAM L. NORTON, JR. & WILLIAM L. NORTON III, NORTON BANKRUPTCY LAW AND PRACTICE § 362 (3d.

Ed. 2008). This core purpose would plainly be frustrated if a creditor could engage a debtor on appeal during the stay period. And this conclusion accords with our precedent, as we have held that the automatic stay bars even a debtor in bankruptcy from appealing an adverse judgment. See TW Telecom Holdings Inc. v. Carolina Internet Ltd., 661 F.3d 495, 497 (10th Cir. 2011). If a debtor cannot appeal an adverse judgment during the bankruptcy stay, then surely a creditor is not permitted to file an appeal when a stay is in place.

We thus hold that filing a cross-appeal constitutes the "commencement or continuation" of a judicial action or proceeding, and so the deadline to file a cross-appeal is tolled by § 108(c)(2) during a bankruptcy proceeding of the cross-appellee. Since the original time to file a cross-appeal had expired during the stay, Vitamins Online's deadline to file a cross-appeal was due thirty days after Vitamins Online received notice of termination of the stay. See 11 U.S.C. § 108(c)(2). Because Vitamins Online filed its notice of cross-appeal six days after the stay was lifted, its cross-appeal was timely.[1]

## C.    Did NatureWise make false or misleading representations?

On the merits, the first issue we must address is the district court's determination that NatureWise made false or misleading representations about its ingredients and with respect to its own Amazon reviews. To demonstrate that a

---

[1] Because we hold that Vitamins Online's deadline was tolled, we need not address whether the time-bar in Federal Rule of Appellate Procedure 4(a)(3) is jurisdictional.

representation was false or misleading, a plaintiff must show that it was either "literally false, either on its face or by necessary implication" or that it was "literally true but likely to mislead or confuse customers." Zoller Lab'ys, 111 F. App'x at 982 (quoting Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir.1997)). Whether a representation is false or misleading is a question of fact, and this determination is therefore reviewed for clear error. Healey v. Chelsea Res., Ltd., 947 F.2d 611, 618 (2d Cir. 1991) ("Matters of misrepresentation . . . are questions of fact, and the trial court's findings as to those facts may not be set aside unless they are clearly erroneous.").

We conclude that the district court did not clearly err in finding that NatureWise made false or misleading claims about its products' ingredients, and further that the district court did not clearly err in finding that NatureWise's manipulation of its Amazon reviews was misleading.

### 1. The ingredient claims.

The district court found that NatureWise made eighteen distinct misrepresentations with respect to its ingredient claims.[2] These misrepresentations are listed below.

- As to certain lots, NatureWise's claim that the First Green Coffee contained 50% chlorogenic acid was literally false;

- As to certain lots, NatureWise's claim that the First Green Coffee contained "Clinically Proven GCA" was literally false;

---

[2] The district court listed nineteen misrepresentations, but two misrepresentations were identical, and so there were only eighteen distinct misrepresentations.

- NatureWise's claims that the First Green Coffee contained the amount of GCA that corresponded with the GCA study were literally false by necessary implication;

- NatureWise's claim that the First Green Coffee was clinically proven after having knowledge that the GCA study was flawed and retracted was literally false;

- As to certain lots, NatureWise's claims that the Green Coffees were vegetarian were literally false;

- As to certain lots, NatureWise's claims that the Green Coffees contained specified amounts of green coffee extract were literally false;

- As to certain lots, NatureWise's claims that the Green Coffee contained 400 milligrams of chlorogenic acids were literally false;

- As to certain lots, NatureWise's claim that the Green Coffees contained no fillers, binders, or artificial ingredients was literally false;

- NatureWise's representations that the First Garcinia had SuperCitrimax were literally false;

- NatureWise's claims that the First Garcinia contained a clinically proven and patented form of HCA bound to calcium and potassium were literally false;

- As to certain lots, NatureWise's claims that the Garcinias were vegetarian were literally false;

- As to certain lots, NatureWise's claim that the Garcinias contained 60 milligrams of potassium was literally false;

- As to certain lots, NatureWise's claim that the Garcinias contained 60% HCA was literally false;

- As to certain lots, NatureWise's claim that the Garcinias contained 300 milligrams of HCA was literally false;

- As to certain lots, NatureWise's claim regarding the specific amount of garcinia cambogia extract was literally false;

- For much of 2012 and 2013, NatureWise's claims, regarding the Green Coffees and the First Garcinia, that (1) each ingredient it used was verified for purity through in-house testing; (2) it had implemented a strict set of FDA compliant manufacturing procedures; and (3) its facilities were regularly inspected by FDA officials were literally false because NatureWise did not know who was making these products.

App'x vol. 4, at 1027–28. On appeal, NatureWise chooses not to address most of these findings, including NatureWise's misrepresentations that (1) its first garcinia cambogia product contains potassium or calcium, (2) both its green coffee and garcinia products are vegetarian, (3) its first garcinia cambogia product contained SuperCitrimax, (4) its first green coffee product contained GCA, and (5) its first garcinia cambogia product has patented HCA. So, by failing to address any of these findings, NatureWise has conceded that many of the district court's findings concerning the ingredient claims were not erroneous. As to the claims that NatureWise does address, furthermore, its arguments are unavailing.

First, NatureWise contends that its claims about "potency, purity, composition and efficacy, and GMP were supported by testing." Aplt. Br. 29. To support this, NatureWise cites evidence that NatureWise's green coffee and garcinia cambogia products met their specifications in at least one study. See App'x vol. 5, at 1289–1290, 1293–1294; see also App'x vol. 8, at 1570–81, 1618–21, 1624–25, 1633–46. However, this evidence does not contradict the district court's findings. The district court found that "certain" lots did not meet their specifications—not that all lots

16

failed to meet their specifications.  App'x vol. 4, at 1027–28.  In order to render the

district court clearly erroneous, then, NatureWise would need to show that every lot

met its specifications.  It has not done so, nor does the evidence support such a

finding.  See Supp. App'x vol. 6, at 1354–1563 (evidence that various lots failed to

meet their specifications).

Second, NatureWise cites evidence establishing that the effects of HCA,

SuperCitrimax, and green coffee were clinically proven.[3]  See App'x vol. 6, at 1354–

65 (study which appears to establish that HCA can assist with weight loss); App'x

vol. 7, at 1529–32 (white paper which purports to establish the benefits of

SuperCitrimax); App'x vol. 5, at 1131–1132 (trial testimony establishing that green

coffee has been shown to have weight loss effects); App'x vol. 7, at 1489–1518

(patent describing the effects of green coffee extract); id. at 1520–26 (study which

shows the effect of green coffee on overweight subjects).  This evidence is irrelevant

here.  The district court did not find that NatureWise's representations were false or

misleading on the grounds that HCA, SuperCitrimax, and green coffee are not

effective.  Instead, the district court found that NatureWise's representations about its

supplements' ingredients were false or misleading in part because NatureWise's

supplements did not contain the advertised ingredient quantities or characteristics.

Thus, NatureWise's argument here fails to show any error on this front.

---

[3] Though NatureWise only mentions HCA and SuperCitrimax here, it cites
evidence about green coffee as well.  We therefore understand NatureWise to have also
meant that the claims about green coffee were clinically supported.

This same deficiency applies to NatureWise's final assertion as well. NatureWise contends that its claims about the ingredients in garcinia cambogia were clinically supported by citing trial testimony discussing studies that demonstrate that HCA was shown to facilitate weight loss, (App'x vol. 5, at 1104, 1296), Dr. Oz's segments about the effects of garcinia cambogia, (App'x vol. 6, at 1370, 1392), and a patent about HCA and weight loss, (App'x vol. 7, at 1470–71). Like before, none of this evidence pertains to the district court's findings. The issue is not that garcinia cambogia is ineffective; the issue is that NatureWise made various misrepresentations about the contents and nature of its garcinia cambogia supplements, like the amount of potassium or HCA the supplements contained. As such, NatureWise has failed to show that the district court clearly erred on any finding about the ingredient claims.

### 2. The review claims.

We turn next to the review claims. As explained above, there are two types of acts that comprise the review claims: the block voting on the helpfulness of reviews and the offering of free products in exchange for reviews. NatureWise has not shown that the district court erred in finding that both acts constituted misrepresentations.

First, as to the block voting, the district court found that the number of helpfulness votes on certain NatureWise products was artificially inflated and therefore literally false. NatureWise argues that this finding was erroneous because neither the court nor Vitamins Online identified any customer review—nor a statement made by NatureWise about a customer review—that was false or

18

misleading.  This misses the point.  As Vitamins Online points out, the issue is not the falsity of the reviews themselves but rather the misleading impression "that many unbiased consumers find positive reviews to be helpful and negative reviews to be unhelpful."  Aple. Br. 27.  Indeed, one of Vitamins Online's experts explained that reviews "have a very significant impact on the purchase decision process" when consumers believe that the reviews are "objective and genuine."  Supp. App'x vol. 3, at 668.  As such, it was not clearly erroneous for the district court to find that NatureWise's block voting misled customers, given that customers were likely under the misimpression that it was unbiased consumers—rather than NatureWise's employees—who found good reviews of NatureWise products to be helpful and bad reviews unhelpful.[4]

Second, as to the free products related to reviews, the district court found that NatureWise made literally false representations because it represented that it did not offer free products in exchange for reviews—even though it did.  NatureWise does not address this point and therefore concedes this finding.  NatureWise does contend, however, that the district court's finding was erroneous because the free products were not contingent on the content of the reviews, and that the act of giving a free product did not render the reviews themselves false.  This is wrong, though, because NatureWise's actions misled consumers about the number of reviews from unbiased

---

[4] This finding is bolstered by the district court's additional finding that NatureWise's management was worried that customers would find out about the block voting.  This fact indicates that NatureWise believed customers were being misled about the helpfulness ratings.

19

customers and the true ratio of putative unbiased positive to negative reviews. As noted above, one expert explained that consumers assume reviews are "credible and objective" and that the reviewers do not gain anything from leaving a review "other than the satisfaction of letting [people] know." Supp. App'x vol. 3, at 676; see also App'x vol. 4, at 1017. And, importantly, the expert concluded that the act of offering a product in exchange for a review is likely to skew the positive results of the review. Supp. App'x vol. 3, at 677. Thus, there was evidence that the act of giving free products in exchange for reviews will mislead other consumers about the objectivity of the reviewers, and so it was not clearly erroneous for the district court to conclude that these actions were likely to mislead customers.

**D.    The district court properly applied the presumption of injury.**

The next issue on appeal is whether Vitamins Online demonstrated that NatureWise caused it to suffer an injury. As noted above, a plaintiff bringing suit under § 1125(a) of the Lanham Act must prove a "causal connection" between the defendant's false advertising and the plaintiff's injuries. See Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2d Cir. 1980). To this end, the district court below concluded that Vitamins Online was entitled to a rebuttable presumption that the defendant's conduct caused plaintiff's injury for 2012 and 2013 because the markets at issue were essentially two seller markets, so it could be presumed that sales wrongfully gained by NatureWise were sales lost by Vitamins Online. NatureWise challenges the application of this presumption on appeal, arguing that such a presumption of injury is not embraced by the Tenth Circuit, that its application

20

was barred by the law of the case, and that the doctrine was otherwise inapplicable. We can quickly reject NatureWise's contention that the presumption of injury doctrine is not applicable in the Tenth Circuit, as well as NatureWise's assertion that the law of the case doctrine barred its application. We further conclude that the district court properly applied the presumption to these facts

### 1. The rebuttable presumption of injury in an essentially two-seller market is applicable in the Tenth Circuit.

We first discuss the rebuttable presumption of injury and explain why the district court did not err in concluding that this presumption is applicable in the Tenth Circuit. The presumption of injury applied by the district court originated in the Second Circuit, where our sister circuit concluded that an injury could be presumed when a defendant engages in comparative advertising—i.e., when a defendant uses a false advertisement to compare its product to the plaintiff's product. McNeilab, Inc. v. Am. Home Prod. Corp., 848 F.2d 34, 38 (2d Cir. 1988). The Second Circuit reasoned that this act of false comparative advertising deprives a plaintiff "of a legitimate competitive advantage and reduced consumers' incentive to select" the plaintiff's product. Id.; see also Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992) (a comparative advertisement is one "which mentions plaintiff's product by name"). The court also hinted that the presumption of injury may apply even without a direct comparison so long as the plaintiff is "obviously in competition" with the defendant. Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 694 (2d Cir. 1994); see also Coca-Cola Co. v. Tropicana Prod., Inc., 690 F.2d

312, 317 n.2 (2d Cir. 1982) (noting that plaintiff in a prior case had to prove actual competition because the products "were not obviously competing for the same consumer dollars").

This "obvious competitor" route to a presumption of injury laid the groundwork for an expanded formulation of the doctrine. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 162 (2d Cir. 2007). In Time Warner Cable, the Second Circuit considered one of DIRECTV's advertisements—which did not mention Time Warner Cable by name—and concluded that a presumption of injury was appropriate because the "nearly binary structure of the television services market" rendered it "obvious to consumers that DIRECTV's claims of superiority are aimed at diminishing the value of cable." Id. This version of the doctrine became the norm, and the Second Circuit would later state it concisely as follows: courts may apply a presumption of injury when "a plaintiff has met its burden of proving deliberate deception in the context of a two-player market[.]" Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 260–61 (2d Cir. 2014). This is the current formulation of the doctrine applied today, although a strict two-player market is no longer inflexibility required. Rather, the market simply must be "sparsely populated." Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH, 843 F.3d 48, 72 n.12 (2d Cir. 2016) (quoting Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 259 (2d Cir. 2014)).[5]

---

[5] Notwithstanding either party's competing claims to the contrary, this Court has neither embraced nor rejected this doctrine previously. The closest we have come to

We find this formulation of the presumption of injury sensible and conclude that, once a plaintiff has proven that the defendant has falsely and materially inflated the value of its product (or deflated the value of the plaintiff's product), and that the plaintiff and defendant are the only two significant participants in a market or submarket, courts may presume that the defendant has caused the plaintiff to suffer an injury. See Merck, 760 F.3d at 260–61. This presumption follows from basic logic: if A and B are the only two products occupying a market or submarket, and if the producer of product B fraudulently represents its product as better than A, then it can be presumed that at least some consumers will choose product B over A in reliance on that false advertising, thereby depriving the producer of A of some sales. See Time Warner Cable, 497 F.3d at 162; see also Coca-Cola, 690 F.2d at 317 ("If Tropicana's advertisement misleads consumers into believing that Premium Pack is a more desirable product because it contains only fresh-squeezed, unprocessed juice, then it is likely that Coke will lose a portion of the chilled juice market[.]"). This is still true even if there are a few other insignificant market participants, so long as the

---

discussing it was in Hutchinson v. Pfeil, where we recited the Second Circuit's formulation of the presumption of injury and proceeded to reject plaintiff's argument that standing could be proven by resorting to the presumption of injury. 211 F.3d 515, 522 (10th Cir. 2000). Although we noted that the doctrine could be applicable in some cases, we ultimately rejected its application to the issue of standing in that case because the plaintiff had "no product in competition with" the defendant. Id. (emphasis omitted). So, our recitation of the doctrine was mere dicta. Id. Nor did our conclusion that the doctrine was inapplicable in the standing context constitute a rejection of the doctrine in its entirety, since the court's conclusion was premised entirely on the fact that the parties' products were not in competition. As such, we did not hold that the doctrine is never applicable outside of the standing context, but instead that it would require—at the very least—that the parties be competitors.

plaintiff and defendant are the only <u>significant</u> actors in the market, since the defendant will still presumably receive most of the diverted sales.  <u>See Church & Dwight Co.</u>, 843 F.3d at 72 n.12 (recognizing that the presumption is applicable if the market is "sparsely populated").[6]

Whether the presumption of injury is applicable therefore turns primarily on the scope and occupancy of the market.  To make these determinations, our antitrust caselaw is instructive.  As we have held in that context, the boundaries of a product market are "defined by cross-elasticity of demand, an economic measure of the substitutability of two products."  <u>Lenox MacLaren Surgical Corp. v. Medtronic, Inc.</u>, 762 F.3d 1114, 1120 (10th Cir. 2014).  "The degree of substitutability turns on sensitivity of demand based on price changes for the other item."  <u>Id.</u>  "A high cross-elasticity of demand indicates that products are substitutes; a low cross-elasticity of demand indicates that the products are not substitutes and, as a result, do not compete in the same market."  <u>Id.</u>  Even when products exist in the same market, though, a subset of products may exist within a distinct submarket.  Such submarkets "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics

---

[6] By limiting this doctrine to those cases where there are just two significant market players, we avoid the concerns raised by our sister circuit in <u>Porous Media Corp. v. Pall Corp.</u>, 110 F.3d 1329, 1335 (8th Cir. 1997).  There, the Eighth Circuit limited the presumption of injury to cases of comparative advertising because "where a defendant misrepresented its own product but did not specifically target a competing product, plaintiff may be only one of many competitors, and without proof of causation and specific injury each competitor might receive a windfall unrelated to its own damage."  <u>Id.</u>  This concern is eliminated when there are only two significant competitors.

and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).  Applying these concepts of markets and submarkets, courts can determine whether a plaintiff and defendant are the only significant competitors in a given market such that a presumption of injury is applicable.

Courts must, however, properly scrutinize a party's proffered market definition.  Generally speaking, "a manufacturer's own products do not themselves comprise a relevant product market." Green Country Food Mkt., Inc. v. Bottling Grp., LLC, 371 F.3d 1275, 1282 (10th Cir. 2004).  To be sure, "products of a single manufacturer may in rare circumstances constitute a relevant product market," id.,[7] but this is the exception—not the rule.  More often, multiple manufacturers will make up a relevant market, even if there are differences between the manufacturers' products.  See id.

Once the relevant market has been defined and determined to be essentially a two-player market, the presumption of injury can be applicable.  However, there are two important caveats to this presumption that courts must keep in mind.  First, this presumption is merely a presumption that the defendant has caused an injury; the degree of injury may have to be considered as a separate issue to be later determined when remedies are addressed.  See Merck Eprova AG, 760 F.3d at 261 (discussing profits, damages, and costs after concluding that a presumption of injury is

---

[7] Monopolies are obvious examples.

25

applicable).[8]  Second, because this is merely a rebuttable presumption, a defendant must be given the chance to rebut the presumption once it is found to be applicable. Id. at 260; see also Porous Media Corp., 110 F.3d at 1336 (holding that the presumption of injury is a "rebuttable presumption"); cf. Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1146 (9th Cir. 1997) (noting that the presumption of consumer deception and reliance is rebuttable).  These limitations on the doctrine are important guardrails against a finding of a "speculative" injury.  McNeilab, 848 F.2d at 38.

**2.    The law of the case doctrine did not bar the presumption of injury here.**

NatureWise next contends that the law of the case doctrine barred the district court from applying a presumption of injury here because the district court previously concluded at summary judgment that such a presumption was inapplicable.  This is incorrect.  The law of the case doctrine "does not apply unless there is a final judgment that decided the issue."  United States v. Bettenhausen, 499 F.2d 1223, 1230 (10th Cir. 1974).  Until a district court issues a final judgment on a claim, it is "free to revisit its earlier rulings."  Elephant Butte Irr. Dist. v. U.S. Dep't of Interior, 538 F.3d 1299, 1306 (10th Cir. 2008) (citing Fed. R. Civ. P. 54(b)).  Here, the district

---

[8] The distinction between the fact of injury and the degree of injury is what distinguishes this case from Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197 (9th Cir. 1989).  There, the Ninth Circuit did not support using the presumption of injury to establish that "plaintiff's damages equal the amount of money spent by defendants on advertising."  Id. at 209.  We do not adopt such a presumption here.  The sparse competitor market can support a finding of causation, but damages, if sought, will typically require some further evidence or analysis.

court's initial refusal to apply a presumption of injury was in the context of the denial of Vitamins Online's partial motion for summary judgment. This denial of summary judgment was not a final judgment resolving the false advertising claim, and so the district court was free to revisit its summary judgment injury ruling at any time prior to final judgment. See Murphy v. FedEx Nat. LTL, Inc., 618 F.3d 893, 905 (8th Cir. 2010) ("[b]ecause a denial of summary judgment is an interlocutory order," the law of the case doctrine does not apply).

### 3.    The district court properly applied the presumption of injury.

Having determined that the presumption of injury can be applicable in the false advertising context, and that it was not barred here by the law of the case doctrine, the next question is whether the district court properly applied this presumption to these facts. Like in the antitrust context,[9] market definition is a question of fact, see Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951, 975 (10th Cir. 1990), and so we are confined to a clearly erroneous standard of review in considering whether the market here was sparsely populated. Although we recognize here that the evidence concerning the sparseness of the market was relatively weak, that is not enough for us to conclude that the district court clearly erred in finding that the parties "were direct competitors in a sparsely populated market." App'x vol. 4, at 1033. This determination was supported by evidence at the

---

[9] We are not adopting our entire antitrust corpus as the relevant standard to use in defining the market. There may be differences in how the relevant market is determined in these two contexts. But the antitrust analogue is a roughly useful template from which to start the analysis.

bench trial that the parties were operating in a two-player market and that the existence of other competitors were de minimis. That is enough to render the presumption of injury applicable. See Church & Dwight Co., 843 F.3d at 72 n.12. We cannot conclude that the district court's application of this presumption of condition was clearly erroneous.

NatureWise failed to rebut this presumption. Although the district court made no explicit findings about whether the presumption had been rebutted, that was implicit in the district court's rulings. We review this "implicit finding" of fact for clear error. United States v. St. Julian, 922 F.2d 563, 566 (10th Cir. 1990); see also United States v. Logan, 2022 WL 3349234, at *5 (10th Cir. Aug. 15, 2022) (unpublished) (reviewing implicit factual finding for clear error). NatureWise has failed to demonstrate clear error on any of these fronts.

First, NatureWise argues that there was no correlation between Vitamins Online's lost sales and NatureWise's sale gains, and so NatureWise cannot have injured Vitamins Online because there can be no causation without correlation. However, the record demonstrates that there was a correlation between Vitamins Online's lost sales and NatureWise's gained sales—specifically, that Vitamins Online's sales dropped at roughly the same rate as NatureWise's sales rose for at least specific quarters—and so this argument does not undermine the presumption of injury.

Second, NatureWise argues that Vitamins Online was required to prove a nexus between the false advertising and the lost sales, which it failed to do. This gets

28

the inquiry backward.  Once Vitamins Online made the requisite showing that the markets in question were composed of just two significant market players, then the district court was entitled to presume that NatureWise caused an injury.  See Merck, 760 F.3d at 261.  At this point, NatureWise bore the burden of showing that it did not cause an injury.  See id. at 260.  Vitamins Online had no additional burden to prove causation at this point; rather, NatureWise bore the burden of disproving causation, which it failed to do.  As such, NatureWise's argument concerning Vitamins Online's burden to show a nexus fails to demonstrate that NatureWise rebutted the presumption of injury.

Third, NatureWise asserts that there were three intervening factors which caused Vitamins Online to lose sales, which undercut any presumption that NatureWise took sales from Vitamins Online.  None of these factors undercut the district court's ruling, however.  For the first factor, NatureWise claims that Dr. Oz's shows on green coffee and garcinia cambogia caused a flood of competitors to enter the market, which is what deprived Vitamins Online of sales.  But this is simply a rehashing of the argument that Vitamins Online and NatureWise were not the only two significant competitors, which we have already rejected.  And, as Vitamins Online correctly points out, this alleged flood of competitors would presumably have resulted in sales losses for NatureWise as well—but NatureWise's sales increased when Vitamins Online's sales decreased.

For the second factor, NatureWise asserts that Vitamins Online lost sales because its products were far more expensive than competitors.  Yet, NatureWise's

29

expert found that Vitamins Online's garcinia cambogia prices were lower than NatureWise's prices for nine of the twelve relevant quarters, and were just a few dollars more expensive in the other three quarters. Similarly, Vitamins Online's green coffee prices were lower than NatureWise's green coffee product in the first and second quarters of 2013, which included the key dates when Vitamins Online's sales dropped as NatureWise's sales rose. The evidence therefore does not support NatureWise's pricing argument.

For the final factor, NatureWise argues that Vitamins Online's products had an average rating of 2.9 out of five stars, and that this was the cause of its poor sales. But most of Vitamins Online's products had a similar average rating both when its sales rose before NatureWise entered the markets and when they fell after NatureWise entered the market and employed in deceptive sales practices. Given that Vitamins Online's product ratings were generally a consistent variable over time, NatureWise's ratings argument does not undercut the district court's finding of a presumption of injury. Thus, NatureWise failed to present sufficient evidence to rebut the presumption of injury.

## E.    Remedies.

The final set of issues concerns the district court's remedies. The district court awarded Vitamins Online disgorgement of NatureWise's profits for 2012 to 2013, and also awarded attorney fees and costs due to discovery improprieties. The district court additionally denied injunctive relief and punitive damages. NatureWise challenges all of the remedies imposed, and Vitamins Online argues that the district

court erred by failing to award profits for 2014+, as well as for failing to award injunctive relief and punitive damages. We affirm the district court's award of profits, attorney fees, and costs, and also conclude that the district court failed to consider properly injunctive relief and punitive damages. Accordingly, we remand so that the district court can consider these remedies in the first instance.

**1.      The district court's award of profits to Vitamins Online was not an abuse of discretion.**

*a)      Disgorgement for 2012 and 2013.*

In light of our conclusion above that the district court did not err in applying a presumption of injury for 2012 and 2013, we conceded that the district court did not abuse its discretion in awarding profits for this period. The only error alleged by NatureWise concerns the district court's calculation of profits, insofar as NatureWise contends that the district court improperly included in its award sales made by Vitamins Online reselling NatureWise's products. To support this point, NatureWise simply asserts that the district court added up all sales detailed in a spreadsheet and awarded the total to Vitamins Online. Yet, adding all the relevant sales in this spreadsheet yields a total far greater than the profits awarded by the district court. This means, then, that the district court did not merely add all the sales and award the total to Vitamins Online; the court must have done further calculations to reach the

award, which NatureWise does not explain.  This argument therefore fails to demonstrate error.[10]

   ***b)  Disgorgement for 2014+.***

  For its part, Vitamins Online contends that the district court erred in failing to analyze properly whether disgorgement was warranted for 2014+.  We disagree.

  First, Vitamins Online suggests that it is erroneous to limit profits to a period in which a plaintiff can show actual damages.  This is incorrect.  Although we did hold in Bishop v. Equinox Int'l Corp. that it "is necessarily an abuse of discretion" to require a showing of actual damages for disgorgement of profits under the Lanham Act, this does not mean a district court cannot consider actual damages at all.  154 F.3d 1220, 1223 (10th Cir. 1998).  To the contrary, we made clear that actual damages remain "an important factor in determining whether an award of profits is appropriate."  Id.  But courts must also consider equitable factors when determining whether an award of profits is appropriate, like a defendant's willfulness or bad faith. See id.  So, the district court was permitted to take Vitamins Online's actual injury into account when considering whether profits are appropriate and when considering how much to disgorge.  And although the district court retained discretion to award profits even if Vitamins Online could not show actual damages for the relevant time

---

[10] As NatureWise concedes, the Lanham Act and UCL claim "stand and fall together" because they "are based on the same facts."  Aplt. Reply Br. 55.  Because we affirm the Lanham Act liability determination, we similarly affirm the UCL liability determination and award of profits.

period, it also retained discretion to deny profits for this period if the equitable balancing did not support an award of profits.  See id.

Second, Vitamins Online argues that it violates the burden-shifting scheme of the Lanham Act to limit a plaintiff's proof of sales to a specific timeframe (e.g., to 2012 and 2013, as the district court did).  This is also incorrect.  To be sure, Vitamins Online is correct that § 1117(a) of the Lanham Act requires that a plaintiff "prove defendant's sales only," and once this is done, the burden shifts to the defendant to prove which portion of the sales are not attributable to the false advertising.  Gen. Steel Domestic Sales, LLC v. Chumley, 627 F. App'x 682, 686 (10th Cir. 2015) (unpublished) (quoting 15 U.S.C. § 1117(a)).  As the Sixth Circuit explained in context of trademark infringement, however, § 1117(a) still requires a plaintiff to "show some connection between the identified 'sales' and the alleged infringement." Max Rack, Inc. v. Core Health & Fitness, LLC, 40 F.4th 454, 472 (6th Cir. 2022), reh'g denied, 2022 WL 3237492 (6th Cir. Aug. 10, 2022).  This requirement makes sense for a false advertising plaintiff too, since otherwise a plaintiff alleging false advertising could simply introduce "total companywide sales data" for the defendant and then put the burden on defendant to disprove that the false advertising "affected every dollar of revenue."  Id.  Section 1117(a) does not presumptively entitle Vitamins Online to all NatureWise's sales proceeds no matter how temporally disconnected from the false advertising injury.  Thus, neither of these arguments demonstrate that the district court abused its discretion in refusing to award profits for 2014+.

33

**2.    The district court's award of attorney fees and costs to Vitamins Online is affirmed.**

We next consider whether the district court abused its discretion in awarding attorney fees and costs to Vitamins Online.  Attorney fees are available to prevailing parties in "exceptional cases."  15 U.S.C. § 1117(a).  While interpreting an identically worded clause of the Patent Act, 35 U.S.C. § 285, the Supreme Court has clarified that the phrase "exceptional case[]" means a case "that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 553 (2014).  This determination is up to the district court's "discretion."  Id.  We have recently held that this same standard applies to attorney fees under § 1117(a) of the Lanham Act.  Derma Pen, LLC v. 4EverYoung Ltd., 999 F.3d 1240, 1246 (10th Cir. 2021).

The district court below awarded Vitamins Online attorney fees for three reasons: (1) because it found that NatureWise willfully deceived customers, (2) because NatureWise failed to produce pertinent evidence, and (3) because NatureWise otherwise abused the discovery process.  Our precedent establishes that these findings provide ample support for the designation of this case as an "exceptional" one, and therefore support an award of attorney fees.  See Derma Pen, LLC, 999 F.3d at 1246 (noting that "unusually vexatious and oppressive litigation practices" is one factor that can render a case "exceptional" to support an award of

attorney fees); see also W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc., 427

F.3d 1269, 1273 (10th Cir. 2005) (in a trademark suit, § 1117(a) applies when the

infringement is "willful").  NatureWise makes just two arguments in an attempt to

show that the district court abused its discretion in awarding attorney fees.  Neither

are availing.

First, NatureWise challenges the district court's finding of discovery

improprieties.  In its order, though, the district court cited numerous examples of

discovery abuse, including NatureWise's failure to preserve evidence, NatureWise's

failure to produce key emails and documents, third-party productions of detrimental

emails and documents that NatureWise failed to produce, and representations to the

court by NatureWise that an electronic source would not contain relevant information

when in fact it did.

In response, NatureWise only makes a roundabout challenge to the

preservation of evidence finding, arguing that the district court wrongly applied an

adverse inference concerning the destruction of sample products.  We review a

district court's choice to adopt an adverse inference for abuse of discretion.  See

Gilbert v. Cosco Inc., 989 F.2d 399, 406 (10th Cir. 1993) (reviewing the decision to

give or refuse an adverse inference jury instruction for abuse of discretion).  The

district court found that the complaint in this suit had already been filed when

NatureWise engaged in testing that destroyed the only available samples of its

product batches, thereby violating a duty to preserve evidence and demonstrating bad

faith.  Putting aside the myriad other discovery abuses that NatureWise does not

challenge—and which would still render this case "exceptional," <u>Derma Pen, LLC,</u>
999 F.3d at 1246—it was not an abuse of discretion to apply an adverse inference on
this basis.  NatureWise does not dispute that it started destructive testing on the day
that the complaint in this suit was filed.  Rather, it argues that this was permissible
testing and that the products would have expired by the time of litigation.  But this
does not change the fact that NatureWise had a duty to preserve this evidence, nor
does it rebut the district court's finding that NatureWise destroyed "bottles it claims
it was required to retain per FDA regulations."  Supp. App'x vol. 1, at 139.  For these
reasons, NatureWise fails to show that the district court abused its discretion in
applying an adverse inference (and thus did not abuse its discretion in considering
this spoliation as support for the attorney fees award).

Second, NatureWise disputes the finding that it willfully deceived customers.
NatureWise contends that it presented evidence of testing which had led it to believe
that its product labels were accurate.  Critically, however, NatureWise ignores (and
omits from its appendix) internal documents and testimony which indicate that
NatureWise was aware that its labels were inaccurate.  <u>See, e.g.</u>, Supp. App'x vol. 3,
at 508–19; Supp. App'x vol. 5, at 1184–89, 1202, 1238–39, 1242–43.  This evidence
supports the district court's finding that NatureWise engaged in willful deception and
there this finding was not clearly erroneous.  NatureWise has thus failed to show that
the district court abused its discretion in awarding attorney fees or costs.

     **3.**    **The district court erred in failing to consider Vitamins Online's
requested injunction.**

We also consider whether the district court erred in its denial of injunctive relief.  The district court denied an injunction on the basis that Vitamins Online was adequately compensated by a disgorgement of profits, and because it found that it would be against the public interest to force NatureWise to remove all its product reviews from Amazon.  App'x vol. 4, at 1042.  But the district court failed to consider that Vitamins Online also requested the court to enjoin NatureWise from "engag[ing] in . . . review manipulation conduct[.]"  App'x vol. 4, at 1041–42. Because the district court considered injunctive relief only as to the removal of all existing reviews on Amazon—and not the injunction against further review manipulation that Vitamins Online requested, (App'x vol. 4, at 990)—it provided "no rational basis in the evidence for the ruling" (denying Vitamins Online's request to enjoin reverse manipulation) and therefore abused its discretion.  Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209, 1227 (10th Cir. 2011) (quoting Wilderness Workshop, 531 F.3d at 1223–24).

On appeal, NatureWise argues that an injunction is unnecessary because it ceased block voting in 2015 and because Vitamins Online has not identified any present manipulation that is causing it harm.  In so arguing, NatureWise does not represent to this Court that it has ceased all review manipulation—just that it has stopped block voting.  This does not necessarily mean that it has stopped providing free products for reviews, which we held above also constitutes a misrepresentation. And the only evidence in the record indicating that NatureWise has stopped manipulating reviews is the testimony of its founder, who the district court concluded

37

was "not a credible witness," "not reliable," and had previously made misrepresentations about review manipulations.  App'x vol. 4, at 996, 1017, 1036.

Even if NatureWise had voluntarily stopped manipulating reviews, voluntary cessation does not normally moot a request for injunctive relief.  Prison Legal News v. Fed. Bureau of Prisons, 944 F.3d 868, 881 (10th Cir. 2019).  The voluntary cessation exception to mootness applies only if the defendant can meet a "formidable burden" to show that the "allegedly wrongful behavior could not reasonably be expected to recur."  Id. (quoting Brown v. Buhman, 822 F.3d 1151, 1166 (10th Cir. 2016)).  NatureWise cannot meet this burden by merely alleging that it has stopped manipulating reviews.  We thus conclude that the district court should consider in the first instance whether to enjoin NatureWise from further engaging in review manipulation.[11]

### 4. The district court erred in failing to consider punitive damages under the UCL.

Finally, we consider whether the district court erred by failing to analyze whether punitive damages were warranted.  It is uncontested that Vitamins Online requested punitive damages under the UCL, and that the district court did not

---

[11] NatureWise contends that Vitamins Online cannot identify an irreparable harm stemming from this review manipulation, but this argument pertains to the merits of the request for injunctive relief.  Since we are remanding for the district court to consider the propriety of injunctive relief in the first instance, we need not decide this issue before the district court has considered it.  See Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1238 (10th Cir. 2005) ("Where an issue has been raised, but not ruled on, proper judicial administration generally favors remand for the district court to examine the issue initially.").

consider this issue.  Although the district court did consider whether enhanced damages under the Lanham Act were warranted, under Utah law enhanced damages are distinct from punitive damages.  Compare United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1236 (10th Cir. 2000) (holding that enhanced damages under the Lanham Act were not permissible when the plaintiff was already "adequately compensated"), with Crookston v. Fire Insurance Exchange, 817 P.2d 789, 808 (Utah 1991) (discussing seven factors that must be considered to award punitive damages under Utah law, only one of which concerns the actual damages award).

NatureWise argues that the district court could not have awarded punitive damages because it did not engage in reprehensible conduct.  This does not fully address the applicability of punitive damages, however, because reprehensibility is just one of seven factors that must be considered in determining whether punitive damages are appropriate in the first instance.  See Crookston, 817 P.2d at 808, 811. In any event, we decline to address whether punitive damages are appropriate under the UCL before the district court has first considered the issue.  See Pac. Frontier, 414 F.3d at 1238.  We therefore instruct the district court on remand to consider whether punitive damages under the UCL are appropriate.

### III.  CONCLUSION

We AFFIRM the district court's determination that NatureWise is liable under the Lanham Act and UCL, and accordingly AFFIRM the district court's award of profits, attorney fees, and costs.  We also REMAND so that the district court can

consider in the first instance whether it is appropriate to enjoin NatureWise from engaging in further review manipulation and whether Vitamins Online is entitled to punitive damages under the UCL.